# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA )
                              )      **CRIMINAL ACTION FILE**
    v.                      )
                              )      **NO. 1:10-CR-251-TWT-AJB-08**
ISRAEL SALGADO,           )      **(Third Superseding)**
                              )
            **Defendant.**     )

## ORDER FOR SERVICE OF
## <u>REPORT AND RECOMMENDATION</u>

Attached is the Report and Recommendation ("R&R") of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. CrR. 58.1(A)(3)(a), (b). The Clerk is **DIRECTED** to serve upon counsel for the parties and directly upon any unrepresented parties a copy of the R&R and a copy of this Order.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the R&R within **fourteen (14)** days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary

hearing for review by the District Court.  Failure to object in accordance with this rule waives a party's right to review.  FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.**  If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986);  *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983).  The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  12th   day of   March   , 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/82)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:10-CR-251-TWT-AJB-08** |
| **ISRAEL SALGADO,** | ) | **(Third Superseding)** |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES MAGISTRATE JUDGE'S
## <u>ORDER AND FINAL REPORT AND RECOMMENDATION</u>

Before the Court are the following pretrial motions: (1) the government's motion to compel palm prints, [Doc. 200]; (2) Defendant Salgado's preliminary and supplemental motions to suppress evidence, [Docs. 353, 377]; (3) a "motion for ineffective counsel," filed by Defendant Salgado *pro se*, [Doc. 401]; and (4) a motion to dismiss indictment, filed by Defendant Salgado *pro se*, [Doc. 405]. The Court held an evidentiary hearing on the motions to suppress, [Doc. 386 (hereinafter "T__")], after which the parties filed briefs, [Docs. 392, 402 (Gov't); 399 (Salgado)]. For the following reasons, the undersigned **RECOMMENDS** that the motions to suppress and to dismiss be **DENIED**. Also, the Court **GRANTS** the government's motion to compel palm prints and **DENIES** Salgado's "motion for ineffective counsel."

**I.      Motion and Supplemental Motion to Suppress Evidence, [Docs. 353, 377].**

**A.      Facts**

On June 10, 2010, at approximately 2:00 p.m., members of a DEA task force went to Defendant Salgado's home at 6280 Florrie Drive in Mableton, Georgia, in order to arrest him on a warrant issued as a result of the original indictment returned in this case. T10, 22. The arrest team was made up of Task Force Agents Shull, Jacobi, and Seebaran, who each arrived in separate unmarked cars. T19. They were dressed in plainclothes with tactical vests that identified them either as police officers or sheriff deputies. T10, 39. Salgado was in his backyard, having just finished mowing the lawn. T10.

The three agents approached Salgado. T18. Seebaran drew his weapon, a Glock pistol. T19, 39, 53. Shull got him off the lawnmower, and patted him down. T11, 19, 20, 40. Seebaran re-holstered his firearm. T40. Either Shull or Seebaran applied handcuffs. T21, 40. Neither Shull nor Seebaran recalled whether Salgado was placed on the ground. T20, 54. Shull did not recall whether his weapon was drawn. T11.[1]

---

[1]      Shull acknowledged that on the date of the arrest, he had either on his person or in his vehicle a rifle and a pistol with a laser sight. He testified that "it was possible" that he used either one in arresting Salgado but that one often would not see the "red dot" from the laser in broad daylight. T33-34.

AO 72A
(Rev.8/82)

Seebaran asked Salgado his name in Spanish, but when it was apparent that Salgado spoke English, further conversations were had in English. T17, 40-41, 55.[2] Salgado was told he was under arrest. T40. Once Salgado was arrested, the agents put away their firearms. T34.

Seebaran asked Salgado whether there were any other individuals in the house. T40. Salgado asked what was going on, and Seebaran replied that they were from the DEA and had information that there may be drug activity in the house. T40. Salgado stated, in English, that there were two people in the house. T11-12, 41, 55-56. He also stated that he lived in the house. T41. Shull asked if they could go in and check on those persons. T11-12, 18. Salgado responded affirmatively. T12.

Jacobi and Shull immediately performed a protective sweep of the house, which took 2-3 minutes. T23, 56. Three individuals were found in the house, and they were handcuffed and brought outside to the carport, where Seebaran had taken Salgado. T12, 43.[3] Five to six minutes later, Seebaran asked Salgado in English for consent to

---

[2] Task Force Officer Aguilar, a native Spanish speaker, arrived while the search of the residence was being conducted. T52.

[3] These individuals, who were not identified at the hearing beyond their signatures on consent-to-search forms, were not arrested. T25.

AO 72A
(Rev.8/82)

search the house,[4] and Salgado orally granted consent without hesitation by saying "yes.". T12, 26-27, 35, 43-44, 52, 57. Seebaran asked him if there were any drugs, weapons or large amounts of cash in the house, and Salgado stated, "no." T44. Shull went to his vehicle and obtained a DEA Consent to Search form in Spanish, which also authorized a search of Salgado's Jeep Cherokee which was parked in the back yard. T12, 13, 35. Salgado's handcuffs were moved to the front. T27. Salgado appeared to read the form since his eyes scanned the document, and then he signed it "I.S." after Shull placed an "X" on the signature line where Salgado was to sign. T12-13, 28, 36, 44-45, 53; Gov't Exs. 1, 2.[5] The other three persons also signed consent-to-search

---

[4] Seebaran testified on cross-examination as follows:

> I asked him if we can search the house and I told him - - I explained to him that we wanted to search the house. I asked him if there was any drugs or weapons or any large amounts of currency in the house, he stated, "No." But I said, do you mind if we search the house? Do you give consent? He said, "Yes."

T57; *see also* T51 ("Can we search your house?"). Shull testified that Seebaran asked Salgado a more limited question, that is whether he would consent to a search of the house for "weapons or drugs," T26-27, 68, although Shull was unable to recall the exact words used by Seebaran. T27, 68. Further, in cross-examination, Seebaran stated that he asked Salgado whether they could "go in and search your house for drugs, weapons and currency." T57-58.

[5] At the evidentiary hearing, although denying that he was presented with the consent-to-search form on June 10, 2010, Salgado admitted that he was able to read

4

forms in Spanish. T14; Gov't Ex. 3.[6] None were told that they had the right to refuse consent. T27.

While the house was being searched, Seebaran also asked Salgado questions in order to fill out a DEA Form 202, which seeks biographical information, and Salgado provided answers to these questions in English. T45-46, 51.

Shull described the atmosphere as cordial. T13. Salgado was cooperative in that he answered all of the agents' questions about his identity. T32. The officers' weapons were holstered. T13. Shull stated that Salgado spoke "pretty good English" and interpreted for the agents for at least one of the other individuals who only spoke Spanish. T14, 15, 16, 46.[7]

that form. T80.

[6]    One of these persons also signed a consent to search form for another vehicle on the premises. T15.

[7]    During the Title III portion of the investigation, Salgado was intercepted speaking with another person about accessing a Spanish-language website. T63. In addition, the intercepted conversation was conducted in Spanish. T67.

5

Salgado signed the consent form with his initials, "I.S." T24; Gov't Ex. 1.[8]

_____

[8] The consent-to-search form, which was translated into English by Certified Translator Alba Males, states as follows in English:

US Department of Justice         CONSENT TO SEARCH
Drug Enforcement Administration
_____

1.      I HAVE BEEN ASKED TO AUTHORIZE THE SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH: (Describe the person, place or things to be searched.)

*6280 Florrie Drive*
*Mableton, GA*
     *&*
*Red Jeep Cherokee*

2.      I HAVE NOT BEEN THREATENED, NOR FORCED IN ANYWAY.

3.      I HAVE CONSENTED FREELY TO THIS SEARCH.

_____*6/10/10*_____        *X I.S.*_____
Date                  Signature

Witnesses:   *S/ Jeffrey Shull*_____
           *S/ Allan Seebarran*_

Gov't Ex. 2B (handwritten entries in italics).

Shull asked him which bedroom was his. Salgado told him which room was his. T24. From that room, agents seized papers, a camera, and a camera memory card. T23-24.[9]

Ultimately, more agents arrived on the scene, for a total of seven to eight agents. T58.

Defendant Salgado also testified at the hearing. He stated that the agents drove up very abruptly, and one agent pointed a 2 1/2 foot rifle with a laser sight at his face. T70-71, 73. He stated that he was abruptly put on the ground by only one agent while the others searched his house, and that this agent put his foot roughly behind his neck. T71, 73, 76. These actions knocked the air out of him. T71. Although Salgado did not resist, he was pulled up by his handcuffs. T71. He stated that he had lesions on his hand from the violence inflicted upon him and has suffered constant backaches from being thrown on the ground. T73. He also complains of vision problems because of having the foot placed on the back of his neck, and reported an inability to sleep and other psychological problems. T73. However, he did not seek medical attention for any of his injuries since he has been detained since the date of his arrest. T79.

---

[9] Agents seized a cell phone on Salgado's person at the time he was arrested. T24.

Salgado denied that any of the agents said anything to him, and when he got to the house, there already were agents there bringing his brother outside in handcuffs. T71. He claimed the agents went inside the house with a dog. T72. He testified that they told him to cooperate with them or he would get 25 years. He replied that he had nothing to say. T72. He also testified that the agents asked for the keys to his truck and searched it without consent. He further testified that he was never shown a search or arrest warrant. T72. He testified that he did not recall signing the consent-to-search form, and he denied having ever been presented with that document. T80. He further testified that he did not remember whether the "I.S." on the consent-to-search form was his signature and also denied that it was his signature. T81. He testified that the only document he signed was the DEA Form 202. T78. Salgado further testified that one of the agents told him they were searching the truck to remove a GPS box they had installed on it. T72.

Salgado also first denied being given a pen with which to sign any document, but then admitted that he signed the Form 202. T78. Salgado stated he attended school until the second year of junior high, in Mexico, and that he could read Spanish. T79.

The Court finds Salgado's testimony not credible and gives it very little weight. First, the Court finds not credible Salgado's testimony that only one agent pointed a

weapon at him and arrested him. It does not appear likely that only one agent would approach and attempt to arrest an indicted subject in a major international drug-trafficking and money-laundering conspiracy when the agents were unaware whether any other persons were in the house. As a result, the Court also rejects Salgado's version that officers entered his house with a dog, although it is entirely conceivable that Shull and Jacobi could have been walking out the other persons in the house at the time Seebaran moved Salgado to the carport. Also, Salgado's testimony about the arresting agent using a long rifle at the time of arrest does not seem truthful, since an agent with such a weapon could not at the same time handcuff an arrestee and keep his rifle secure at the same time.

The Court also finds incredible Salgado's complaints about being roughly handled during his arrest since he acknowledged that he did not seek medical treatment for any of his claimed injuries.

The Court next rejects Salgado's testimony that his Jeep was searched without consent. As of June 2010, the agents would not need to go inside a vehicle to locate an installed GPS device.

Finally, the Court finds that Salgado's testimony that he did not sign the consent-to-search form was not credible. He first denied having received a pen, [T79],

and then stated he could not recall whether the "I.S." on that document was his signature, before he denied that it was his signature, [T81]. He also stated that he only signed the Form 202, but that document is signed by the agent, not the subject. T48. Also, although he only initialed the consent-to-search form and signed his full name on his "Plea with Counsel" forms when arraigned on the original and superseding indictments, [*see* Docs. 51, 145], the first initials of his signature on the plea forms are similar to the initials on the consent form in terms of the angle of the "I" and the "S," and any slight differences are easily accounted for due to his being in handcuffs. As a result, the Court concludes that the agents' testimony about the events of June 10, 2010, and specifically the circumstances surrounding Salgado's consent to search, is more truthful.

**B.      Contentions of the Parties**

The government first argues that the agents properly conducted the protective sweep of the residence because they had a reasonable belief based on Salgado's statement that others were inside, and they were aware that not all persons to be arrested on the indictment had been arrested. [Doc. 392 at 8-9]. The government also argues that the scope of the sweep was properly limited. [*Id.* at 9].

10

It next contends that Salgado gave voluntary consent orally and in writing. [*Id.* at 12]. It posits that Salgado's initials, which served as his signature on the form, are similar to his full signature on the not-guilty pleas, and any differences are reasonably explained due to the fact that his hands were in handcuffs. [*Id.*]. It also argues that Salgado's testimony that he did not sign the consent form was not credible. [*Id.* at 13]. As to voluntariness, the government argues that the fact that Salgado was in custody and in handcuffs did not render his consent involuntary. [*Id.*]. Instead, it asks the Court to accept the agents' testimony that the encounter was cordial and cooperative. [*Id.* at 14]. It also argues that the evidence shows that Salgado understood both English and Spanish, since he assisted the agents in translating for one of the other detained persons and admitted to being able to read Spanish, and therefore was capable of understanding the oral and written consent requests. [*Id.* at 16]. Finally, the government argues that even though Salgado may have been asked orally for a consent to search that was limited to drugs, weapons, and cash, he signed a general consent to search. [*Id.* at 18-19]. Since the standard is what would the typical reasonable person have understood he was signing, the government argues that the written consent to search authorized a general search of the residence and the

Jeep. [*Id.* at 19-20]. Finally, the government argues that Salgado never limited the search or withdrew his consent. [*Id.* at 20-21].

In response, Salgado argues that he did not voluntarily (or knowingly) consent to a search. [Doc. 399 at 22-23]. He contends that he did not sign any form, although if he did sign a form he did not know what he signed in that he thought he was signing the Form 202. [*Id.* at 23]. He disagrees that his initials are similar to his signature on the plea forms. [*Id.* at n.10]. He also argues that the record does not conclusively establish that he was proficient in reading in any language. [*Id.* at 23].

Salgado next argues that any such consent was not voluntary due to the violent circumstances of his arrest, *see supra* p. 7. [Doc. 399 at 24]. He claims that any consent was tainted because he was in custody. [*Id.* at 26]. He also points to the fact that he was not *Mirandized* prior to being asked for consent, nor was he told he had a right to refuse to consent. [*Id.*]. He next argues that there was no probable cause to seize the items that the agents seized, nor were they seized lawfully under the plain-view or exigent-circumstances exceptions to the warrant requirement. [*Id.* at 27-29]. He also argues that the protective sweep was unwarranted, and that the sweep tainted the subsequent consent search even if nothing was seen or seized during the sweep. [*Id.* at 31-33].

12

Salgado's main argument is that the agents exceeded the scope of any authorized consent to search because he first was asked whether he consented to a search of the residence for drugs, weapons, and currency, and was never advised that he was consenting to a more general search. [*Id.* at 10-11]. He argues that to the extent that he consented, he consented to a more limited search for drugs, weapons, and currency, and not the more expansive consent embodied in the written form. [*Id.* at 13]. He also argues that the written consent form, which referred to the fact that he "ha[d] been asked to authorize the special agents of the Drug Enforcement Administration to search" cannot be interpreted as a separate authorization to search but rather a ratification of the earlier oral consent, which was limited to a search for drugs, guns and currency, and he argues that therefore he did not consent to a new and broader search. [*Id.* at 14]. He also argues that the fact that the written form stated the "place or things to be searched" yet nothing was listed for things to be searched, demonstrates that the agents tricked him to expand the search. [*Id.* at 16-17].

Salgado next argues that a New Jersey appellate case supports his position that the consent in this matter was limited to a search for drugs, weapons, and currency. In *State v. Leslie*, 338 N.J. Super. 269, 768 A.2d 818 (2001), the court found that when the defendant affirmatively consented to a state trooper's request to take a look inside the

defendant's automobile passenger compartment to find information to identify the driver, a written consent form which expanded the search to the entire vehicle was improper:

> the State essentially disregards the trooper's acknowledgment as to what he told defendant he was seeking and what the consent form was intended to effect. There is no question, from the trooper's own testimony, that he told defendant he was seeking identification and - - more importantly - - that he wanted to take "a look inside the passenger's compartment." That was the limited search that the officer told defendant he wanted to accomplish, and it was that limited search for which the officer asked defendant's consent.
>
> The language of the written consent form did not expand that search area. The reference to "all packages and compartments within" is wholly consistent with the oral description the officer had already given defendant: the passenger compartment of the vehicle. In light of the officer's oral request and explanation to defendant, the only reasonable interpretation of the language on the written form is that the words "packages and compartments within" referred to packages and compartments within the passenger compartment-which is what the officer had said he wanted to search, and which would include areas where the missing documents would likely be found: a glove compartment, a console compartment, or door pockets within the passenger compartment of the vehicle.

*Id.*, 338 N.J. Super. at 275-76, 768 A.2d at 821-22. Salgado argues that his case is stronger than that of the defendant in *Leslie*, since the written consent document here was not explained to him, he had limited education, unlike Leslie he was in custodial restraints, and it was unreasonable to expect Salgado to parse the general language of

14

a document that even the agents did not understand (because it was in Spanish). [Doc. 399 at 19-20].

The government replies that Salgado's testimony was not credible, and his uncorroborated testimony was self-serving whereas Shull and Seebaran's testimony corroborated each other's. The government also points to the fact that Salgado admitted at the evidentiary hearing that he could read the consent-to-search form. [Doc. 402 at 5-6 (citing T80)]. It also argues that the protective sweep was justified. [*Id.* at 6-8]. As to Salgado's argument that at most he consented to a limited search for drugs, weapons, and currency, the government contends that the agents could not have known that Salgado's scanning and subsequent signature on a general consent-to-search form telegraphed to the agents a more-limited-in-scope consent. [*Id.* at 9].

Further, the government distinguishes *Leslie* on the grounds that in that case the written consent-to-search form authorized a search of "all packages and compartments within," which arguably did not cover the trunk of the vehicle, whereas here, the written consent-to-search form was open ended. [*Id.* at 9-10]. It also argues that it was Salgado's responsibility to limit the scope of the search. [*Id.* at 10-11].

## C.    Discussion

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. Amend. IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York,* 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5th Cir. 1973)[10]); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11th Cir. July 8, 2009).  Thus, the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

---

[10]    In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to October 1, 1981.

A search conducted pursuant to consent is a recognized exception to the requirements of probable cause and a search warrant. *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (citing *United States v. Baldwin*, 644 F.2d 381, 383 (5th Cir. 1981)).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality-of-circumstances inquiry). Further, " '[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550

17

(1968)); *see also Florida v. Bostick,* 501 U.S. 429, 438 (1991) (" 'Consent' that is the product of official intimidation . . . is not consent at all.").

The Eleventh Circuit has identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. *Blake*, 888 F.2d at 798-99. However, the failure to advise the defendant of his right to refuse to consent will not invalidate an otherwise valid consent to search. *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

A search is impermissible when an officer does not conform to the limitations imposed by the person giving consent. *Zapata*, *id.*; *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990); *see also United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992) (holding that consensual search is confined to the terms of actual consent given). When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search "is constrained by the bounds of

18

reasonableness: what a police officer could reasonably interpret the consent to encompass." *Strickland*, 902 F.2d at 941; *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness - - what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). To ascertain what conduct is within the "bounds of reasonableness," the Court must consider what the parties knew to be the object (or objects) of the search. *See Jimeno*, 500 U.S. at 251; *Martinez*, 949 F.2d at 1119. A general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items. *Martinez*, 949 F.2d at 1120.

Nonetheless, a defendant's lack of knowledge of what the officer is searching for does not change the effect of a "general consent." *United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995) (interpreting *Jimeno*). The court in *Snow* concluded that it is self-evident that a police officer seeking general permission to search is looking for evidence of illegal activity. *Id.* It further noted that if the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search would be limited in some way. *Id.*

19

The Court concludes that Salgado voluntarily consented to the search of his residence and that the consent was not limited to merely drugs, weapons, and currency.

First, although Salgado was in custody at the time of his arrest, that fact does not vitiate his ability to voluntarily consent. Although sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 240, n.19 (1973), " 'custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search.' " *United States v. Barnett*, 989 F.2d 546, 555 (1st Cir.1993) (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)); *see also Bostick*, 501 U.S. at 435-36 (explaining that consent can be voluntary even though the detainee does not feel free to leave).

Second, the Court has rejected as not credible Salgado's claims that his arrest was unnecessarily violent. *See supra* pp. 8-10. The Court recognizes that in any arrest there is present a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain the consent. *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973). The credible evidence in this case requires that inquiry to be answered "no." By the time Salgado was asked to consent, law-enforcement officers' firearms were holstered and any law-enforcement officers

20

in Salgado's presence were not engaging in any coercive conduct towards him. *See United States v. Broome*, No. 1:05-CR-135-WSD, 2006 WL 508054, at \*6 (N.D. Ga. Feb. 28, 2006) (finding voluntary consent despite defendant's custodial status where "agents' conduct toward Defendant, both before and after his arrest, was not coercive, threatening or intimidating"); *see also United States v. Telly*, 362 Fed. Appx. 83, 86-87 (11th Cir. Jan. 21, 2010) (finding voluntary consent where defendant was in handcuffs and in custody because officers did not employ any coercive tactics, brandish their weapons, or threaten, lie, or otherwise pressure defendant into acceding to their request for consent to search). As to this factor, it is also significant that Salgado's custodial status was supported by probable cause in light of the indictment.

Further, the fact that the agents did not read Salgado his *Miranda* rights does not affect the Court's conclusion that no undue coercion was employed. A consent to search is not a testimonial communication that requires the giving of *Miranda* warnings before consent is sought. *Hildago*, 7 F.3d at 1568 (rejecting argument that consent to search was invalid since it was given after defendant invoked right to remain silent because consent to search "is not in itself evidence of a testimonial or communicative nature") (citations omitted) (punctuation altered).

21

The Court also rejects Salgado's claim that the protective sweep was improper and tainted any consent. "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337 (1990). Although the arrest warrant no longer serves as justification to search the home, law enforcement may still conduct a protective sweep following an individual's arrest. *Id.* "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.* at 327. Incident to an arrest, the officers, as a precautionary measure, may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without probable cause or reasonable suspicion. *Id.* at 334. Beyond this limited search, the protective sweep is constrained by the following requirements. *Id.* at 334-36. First, the sweep may occur only when "the searching officer 'possesse[s] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing' . . . that the area swept harbored an individual posing a danger to the officer or others." *Id.* at 334 (quoting *Michigan v. Long*,

22

463 U.S. 1032, 1049-50 (1983)). Second, the sweep "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. Third, "[t]he sweep [may] last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36; *see also United States v. Sunkett*, 95 F. Supp. 2d 1367, 1368-69 (N.D. Ga. 2000) (Story, J.) (distinguishing between a "type one" *Buie* search, which requires no probable cause or reasonable suspicion, and a "type two *Buie* search," which requires reasonable suspicion).

The question in this case is whether the agents could conduct a lawful protective sweep where the defendant was arrested outside the residence. The Eleventh Circuit has not issued a published opinion dealing with this exact factual situation or one somewhat analogous. *Cf. United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991) (en banc) (concluding that a protective sweep of the home was proper even when defendant had been arrested in the garage). However, in *United States v. Flores*, 380 Fed. Appx. 921, 924 (11th Cir. May 28, 2010), agents sent a confidential informant ("CI") inside the defendant's residence to consummate a drug deal. Once the CI signaled that the drugs had arrived, the agents entered the home and arrested three individuals. The *Flores* Court stated that because the agents had reason to believe there

23

would be six or seven people at the house during the transaction, but only three people were visible when they arrived, in the "interest of officers' safety, the protective sweep was justified, citing *Tobin*, 923 at 1513; *see also United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983) ("Law enforcement officers who have lawfully apprehended a suspect on a portion of a structure (here it was an open porch built as a part of the home) which they have reason to believe contains dangerous third persons who might pose a threat to their safety have a right to conduct a reasonable security check of such premises."); *McGeehan v. Wainwright*, 526 F.2d 397, 398-99 (5th Cir. 1976) (upholding security sweep of trailer where one occupant came outside to be arrested and officers had reason to believe someone else was inside, and citing cases).[11]

Other courts have concluded that a protective sweep in situations somewhat analogous to this case was lawful. *See United States v. Cavely*, 318 F.3d 987, 996 (10th Cir. 2003) (holding protective sweep justified where homeowner arrested outside his home (on driveway just outside back door of residence) told officers that he had a

---

[11] In *United States v. Chaves*, 169 F.3d 687, 691-92 (11th Cir. 1999), the court found unlawful the protective sweep of a warehouse 45 minutes after defendants were arrested outside, on the grounds that the government failed to show an immediate need to enter the warehouse to protect themselves or other persons in the area, given the delay.

24

"friend" inside, but friend did not appear after police announced their presence). *Cf. United States v. Colbert*, 76 F.3d 773, 777-78 (6th Cir. 1996) (protective sweep of apartment after defendant was arrested outside was unreasonable as the officers had no information that additional individuals may have been present in the apartment). *But see United States v. Cordova*, 758 F. Supp. 2d 1367, 1377-80 (N.D. Ga. 2010) (Duffey, J.) (holding that entry into the home where defendant arrested 20 feet away from home improper).

Here, Salgado told the arresting agents that two other persons were in the residence, resulting in at least a 1:1 ratio between the three agents and the occupants of the residence. The agents had parked their vehicles in the backyard of the residence, which made it a security risk to have to withdraw from the property with unknown persons still in the residence. The agents did not know if any of the other persons to be arrested in the case were located in the house. Thus, the agents had reason to believe that other persons were in the location that could potentially be a risk to their safety, and they thus properly conducted the protective sweep.

Even if the protective sweep were improper under *Buie*, the Court would not recommend the conclusion that it tainted the consent to search. It is significant to the Court that Salgado, although mentioning that he observed agents coming out of his

AO 72A
(Rev.8/82)

house with his brother and others, did not testify that he agreed to allow the agents to search either because of the alleged unlawful entry into his home or because he merely acquiesced to the agents' show of authority. Instead, he denied that he consented at all, orally or in writing. The determination of a voluntary consent to search is subjective. *United States v. Wilson*, 895 F.2d 168, 871 (4th Cir. 1990); *Amato v. City of Richmond*, 875 F. Supp. 1124, 1125 (E.D. Va. 1994) ("Th[e] test [for voluntary consent] is subjective to the extent that it turns on whether the consenting individual actually gave his consent freely and voluntarily.") (citing *Wilson*, *id.*). Since Salgado (incredibly) claims that he did not consent (as opposed to claiming his consent was not voluntary), the lawfulness of the protective sweep, which resulted in neither the observation nor seizure of any evidence, did not affect Salgado's decision whether or not to consent.

The Court also finds that there were no other coercive police procedures that adversely affected Salgado's ability to voluntarily consent in this case. In addition to the reasons stated *supra* pp. 8-10, the Court credits the agents' testimony that the atmosphere was cordial and that Salgado was cooperative, even to the extent of translating on behalf of the agents. This fact also goes to the next factor - - the defendant's cooperation with the police. The credible evidence is that Salgado was cooperative, thus pointing towards a conclusion that he voluntarily consented.

AO 72A
(Rev.8/82)

Next, although there is no evidence that Salgado was advised of his right to refuse to consent, as noted above, the failure to so notify a person asked to consent does not vitiate voluntary consent. *Zapata*, 180 F.3d at 1282.

As to the defendant's education and intelligence, Salgado admitted at the evidentiary hearing that he was able to read the consent-to-search form, which did not contain any complicated terms or concepts. Also, the evidence demonstrated that Salgado was capable of using a computer and accessing various webpages, and translated for at least one other person on the premises. Thus, he exhibited sufficient intelligence and mental faculties to be able to voluntarily consent.

Finally, as to a belief that no incriminating evidence would be found, there is no evidence as to this factor, so the Court does not discuss it further.

Salgado's principal argument is that he consented to a limited search of his home for drugs, weapons, and currency only. First, the Court credits Seebaran's testimony on this point because Shull testified that his memory was faulty and Seebaran was the person who asked Salgado for consent. Seebaran testified initially on cross-examination that he asked for general consent, and it was only upon a more narrow cross-examination question that he stated that he asked Salgado to search for drugs,

27

weapons, and currency. The Court credits Seebaran's initial answer because he was asked how that happened and he replied that

> "I asked him if we can search the house and I told him - - I explained to him that we wanted to search the house. I asked him if there was any drugs or weapons or any large amounts of currency in the house, he stated, "No." But I said, do you mind if we search the house? Do you give consent? He said "Yes."

T57. That answer sounded more likely to have been asked than the subsequent, more directed question about asking for consent to search for drugs, weapons and currency.

In any event, three facts convince the Court that Salgado voluntarily consented to a general search of his residence. First and foremost, Salgado did not testify that he consented to a limited search. He denied that he consented or was even asked to consent. Thus, he cannot be said to have limited his consent to search to the more limited version of the request. This critical fact also distinguishes this case from *Leslie*, where the court only had the officer's testimony to glean the scope of the consent given.

Second, Salgado did not testify that he signed the consent-to-search form because he thought he was merely confirming the more limited oral consent. Again, he denied having consented at all, and it is his subjective state of mind that is central to the issue to be decided.

Third, the credible evidence is that Salgado appeared to read the written consent-to-search form, which did not limit the consent to search to drugs, guns and weapons. His assistance in translating the agents' interview with at least one other person demonstrates that he was able to switch back and forth between English and Spanish with sufficient ease to have detected, in his own mind, a divergence between what the agents supposedly asked him orally and the document they asked him to sign.

As a result, the Court finds that Salgado voluntarily consented to the search of his residence, and thus **RECOMMENDS** that Salgado's preliminary and supplemental motions to suppress evidence, [Docs. 353, 377], be **DENIED**.

## II. "Motion for ineffective counsel," filed by Defendant Salgado *pro se*, [Doc. 401].

In this motion, the Court construes Salgado's motion as seeking to have new counsel appointed for him. This motion is **DENIED** for the following reasons. First, the Court explained to Salgado when it replaced Salgado's last court-appointed lawyer that the Court would not be as sympathetic to his complaints of ineffective assistance of counsel the next time. [Doc. 342].

Second, his present motion was filed on February 27, less than six weeks before his trial. He waited until after the evidentiary hearing, and his lawyer filed an excellent

29

post-hearing brief before he filed his motion. Thus, the motion is filed too late and smacks of a delay tactic by the defendant.

Third, and most importantly, the motion contains no facts as to why his current counsel should be replaced, and the Court is unaware of any. In fact, Mr. Finlayson, Salgado's current counsel, has zealously and expertly represented him, as he does in all other cases before the Court. Although the undersigned is recommending that Salgado's motion to suppress be denied, it was Mr. Finlayson's effective cross-examination that laid the groundwork for his serious arguments challenging the consent-to-search theory posited by the government. But for the Court's finding that Salgado's suppression hearing testimony was not credible, the issues in the motion would have been closer and the decision more difficult to make.

Thus, Defendant's motion for ineffective counsel, [Doc. 401], which the Court construes as a motion to replace counsel, is **DENIED**.

## III. Motion to dismiss indictment, filed by Defendant Salgado *pro se*, [Doc. 405].

This motion should be **DENIED** for two reasons. First, Salgado is represented by counsel, and as such cannot as a matter of course and without prior permission file motions *pro se*. N.D. Ga. CrR. 57.1(D)(3).

30

Second, on the merits, he contends that the indictment should be dismissed because there was no competent evidence submitted to the grand jury about him. A defendant is not entitled to litigate the sufficiency of the evidence presented to the grand jury. *United States v. Georgalis*, 631 F.2d 1199, 1206 (5th Cir. 1980); *United States v. Gower*, 447 F.2d 187 191 (5th Cir. 1971). Nor may a district court dismiss an indictment prior to trial on grounds of insufficiency of evidence. Neither this judge nor the District Judge is authorized to do that. *United States* v. *Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (A "court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial." *Sharpe*, 438 F.3d at 1263 (quoting *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987)). The proper avenue to challenge the sufficiency of the government's evidence is by way of a motion for judgment of acquittal after the close of the government's case, and not by a pretrial motion to dismiss. *United States v. Salman*, 378 F.3d 1266 (11th Cir. 2004).

As a result, the undersigned **RECOMMENDS** that Salgado's *pro se* motion to dismiss the indictment, [Doc. 405], be **DENIED**.

31

## IV.    Government's motion to compel palm prints, [Doc. 200]

The government seeks to compel Salgado to give exemplars of his palm prints. [Doc. 200].  Defendant objects but recognizes that the law is contrary to this objection.  [Doc. 376].

"It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by the privilege against compulsory self-incrimination."  *United States v. Dionosio*, 440 U.S. 1, 4 (1973).  The Fifth Amendment privilege "offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture."  *Schmerber v. California*, 384 U.S. 757, 765 (1966).  "[T]he privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."  *Id.* at 764.

Additionally, courts have held that compelling fingerprints is not considered a search under the Fourth Amendment. *See Dionosio*, 440 U.S. at 15. "The fingerprinting itself 'involves none of the probing into an individual's private life and thoughts that marks an interrogation or search.' "  *Id.*  Palm print exemplars, like fingerprints, may

AO 72A
(Rev.8/82)

be compelled. *In re Grand Jury Proceedings*, 558 F.2d 1177, 1179 (5th Cir. 1977); *In re Reardon*, 445 F.2d 798 (1st Cir. 1971) (holding that defendant was not entitled to relief from an order requiring him to have his palm print taken on the ground that the prosecution's evidence could not be obtained by administrative summons); *United States v. Pakala*, 329 F. Supp. 2d 178, 180 (D. Mass. 2004) (holding that defendants may be ordered to submit to the taking of their palm prints).

In light of these authorities, the motion is **GRANTED**, [Doc. 200], subject to the directive that the evidence taken from him, and the comparisons made by government palm print experts, be preserved and maintained for discovery, use at trial, and counter evidence, if necessary.

## V.      Conclusion

For all the above reasons, the undersigned **RECOMMENDS** that Defendant Salgado's the motions to suppress, [Docs. 353, 377], and to dismiss, [Doc. 405], be **DENIED**.  Also, the Court **GRANTS** the government's motion to compel palm prints, [Doc. 200], and **DENIES** Salgado's "motion for ineffective counsel," [Doc. 401].

The Court has now ruled on all pending motions in this matter.  Therefore, the case as to this Defendant is **CERTIFIED READY FOR TRIAL**.

33

**IT IS SO RECOMMENDED, ORDERED and CERTIFIED**, this  12th  day

of   March, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/82)